UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KANARRISO DONNELL LOVELESS,
     Petitioner,

vs.                                  Case No.:  3:21cv2569/LAC/EMT

FLORIDA DEPARTMENT OF
CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Kanarriso Loveless (Loveless) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed an answer and attached relevant portions of the state court record (ECF No. 6 (answer), ECF Nos. 6-1 through 6-19 (state court record)).  Loveless filed a reply (ECF No. 8).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Loveless is not entitled to habeas relief.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 6-1 through 6-19).[1]  Loveless was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2015-CF-318, with one count of Aggravated Assault by Threat With a Firearm (Actual Possession With Discharge) (Count 1), one count of Possession of a Firearm by Convicted Felon (Count 2), one count of misdemeanor Battery (Count 3), and one count of misdemeanor Discharging a Firearm (Count 4) (ECF No. 6-2 at 15 (information)). Count 2 was severed for trial, and a jury trial on Counts 1, 3, and 4 was held on February 8–9, 2016 (ECF No. 6-2 at 115–424 (transcript of jury trial)).  The jury found Loveless guilty as charged on Counts 1, 3, and 4, with specific findings that Loveless actually possessed and discharged a firearm during commission of Count 1 (ECF No. 6-2 at 50 (verdict)).  At the conclusion of trial, Loveless entered a no contest plea to Count 2 (*see* ECF No. 6-2 at 426–29 (transcript of jury trial)).  The court sentenced Loveless to a mandatory term of twenty years in prison on Count 1

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

and a concurrent term of five years in prison, with a three-year minimum, on Count

2 (ECF No. 6-2 at 87–95 (judgment); ECF No. 6-2 at 424–34 (transcript of

sentencing)). The court sentenced Loveless to time served on Counts 3 and 4 (*see*

*id.*).

Loveless appealed the judgment to the Florida First District Court of Appeal

(First DCA), Case No. 1D16-995 (ECF No. 6-3 (Loveless' initial brief); ECF No. 6-

4 (State's answer brief)). On May 22, 2017, the First DCA affirmed Loveless'

judgment and sentence per curiam without written opinion (ECF No. 6-5 (decision)).

*Loveless v. State*, 226 So. 3d 819 (Fla. 1st DCA 2017) (Table). The mandate issued

June 7, 2017 (ECF No. 6-6 (mandate)).

On January 31, 2018, Loveless filed a motion for post-conviction relief in the

state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure

(ECF No. 6-7 at 11–24 (Rule 3.850 motion)). Loveless subsequently filed an

amended Rule 3.850 motion, asserting four grounds for relief (ECF No. 6-7 at 33–

44 (amended Rule 3.850 motion)). The circuit court appointed counsel to represent

Loveless and held a limited evidentiary hearing on Ground One of the amended Rule

3.850 motion (*see* ECF No. 6-7 at 69–70 (order setting evidentiary hearing and

appointing counsel), 116–50 (transcript of evidentiary hearing and exhibits)). On

February 6, 2020, the circuit court issued a final order denying Loveless' amended

Rule 3.850 motion (ECF No. 6-7 at 151–56 (order)).  Loveless appealed the decision

to the First DCA, Case No. 1D20-0606 (ECF No. 6-12 (Loveless' initial brief); ECF

No. 6-13 (State's answer brief); ECF No. 6-14 (Loveless' reply brief)).  The First

DCA affirmed the circuit court's decision per curiam without written opinion on July

23, 2021 (ECF No. 6-15 (decision)).  *Loveless v. State*, 324 So. 3d 931 (Fla. 1st DCA

2021) (Table).  The mandate issued October 5, 2021 (ECF No. 6-19 (mandate)).

Loveless commenced this federal habeas action on November 10, 2021 (ECF

No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that

was adjudicated on the merits in state court unless the state court's decision "was

contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United

States Supreme Court explained the framework for § 2254 review in *Williams v.*

*Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant
> the writ if the state court arrives at a conclusion opposite to that reached

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in

light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d).  *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).  Even then, the petitioner must

show that he is in custody "in violation of the Constitution or laws and treaties of the

United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in

"actual prejudice," meaning, the error "had a substantial and injurious effect or

influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993) (internal quotation marks and citation omitted).

III.   LOVELESS' CLAIMS

    **A.**   **Ground One:  "Petitioner was denied effective assistance of counsel where his trial counsel failed to call alibi witness denying him the right to fair trial in violation of the 6th Amendment of the Federal Constitution."**

Loveless alleges on the date of the charged offenses, November 18, 2014, he

was at work at J.D. Performance, located on Navy Boulevard in Pensacola (ECF No.

1 at 8).  Loveless alleges Randy Wilson was at work with him at the time of the

offenses (*id.*).  Loveless alleges he told defense counsel that Randy Wilson could

verify that the two of them were at work (*id.*).  Loveless alleges defense counsel

failed to call Mr. Wilson as a trial witness even though Wilson was available to

testify and would have provided an alibi that supported Loveless' defense of

mistaken identity (*id.*).  Loveless states he presented this ineffective assistance of

counsel (IAC) claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at

8–9).

The State concedes Loveless exhausted this IAC claim by presenting it in his amended Rule 3.850 motion and post-conviction appeal (ECF No. 6 at 20).  The State contends the state courts' adjudication of the claim is entitled to deference under § 2254(d) (*id.* at 22–27).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)).  "Even if many reasonable lawyers would not have

done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Strategic or tactical decisions, made after a thorough investigation of the law and facts, "are virtually unchallengeable" in an ineffective assistance claim. *Strickland*, 466 U.S. at 690. The Supreme Court has instructed that in reviewing claims of ineffective assistance the court must be mindful of the following:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260

(11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is

"doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.    Federal Review of State Court Decision

Loveless presented Ground One in his amended Rule 3.850 motion (ECF No. 6-7 at 36–37).  The claim was the subject of the evidentiary hearing (ECF No. 6-7 at 116–45 (hearing transcript)).

At the evidentiary hearing in February 2020, Attorney Sutherland testified he had been a trial attorney for forty-seven years and was appointed to represent Loveless in April 2015 (ECF No. 6-7 at 125–38).  Attorney Sutherland testified he met with Loveless in preparation for trial and several times prior to trial.  Sutherland testified Loveless denied committing the crimes.  Attorney Sutherland testified that in June 2015, Loveless and his girlfriend, Earlene Millender, told Sutherland Loveless was at work when the crimes occurred on November 18, 2014, between 9:30 a.m. and 11:00 a.m.  Attorney Sutherland testified he diligently attempted to speak with Randy Wilson, to no avail.  Attorney Sutherland testified Earlene

Millender provided the phone number and address of J.D. Performance, where Randy Wilson worked.

Attorney Sutherland testified he left two phone messages for Wilson, but Wilson did not return the calls. Sutherland testified he went to J.D. Performance on two occasions, but Randy Wilson was not there and did not contact Sutherland even though Sutherland left his business card and asked that Wilson call. Attorney Sutherland testified that during his second visit to J.D. Performance, he told an employee he was trying to verify whether Mr. Loveless was working on the morning of November 18, 2014. According to Sutherland, the employee went to a file cabinet, looked through paperwork, and said Loveless was not working that day. Attorney Sutherland testified he then sent Randy Wilson a letter explaining why he wished to speak with him and asking Wilson to contact him. The letter, dated August 3, 2015, was admitted into evidence as State's Exhibit 2 (*see* ECF No. 6-7 at 146 (letter)). Attorney Sutherland testified Randy Wilson did not respond to the letter. Sutherland testified on August 10, 2015, he sent Mr. Wilson a subpoena for his deposition on August 24, 2015. A copy of the subpoena was admitted into evidence as State's Exhibit 3 (*see* ECF No. 6-7 at 147 (subpoena)). Attorney Sutherland testified during this time, he kept Loveless apprised of his attempts to obtain a statement from Mr. Wilson, as evidenced by Sutherland's letter to Loveless dated

August 11, 2015, admitted into evidence as State's Exhibit 4 (*see* ECF No. 6-7 at 148–49 (letter)).

Attorney Sutherland testified the subpoena prompted Randy Wilson to contact him, and Wilson told him Loveless was not working on November 18, 2014. Attorney Sutherland testified he told Mr. Wilson he would excuse him from the deposition if Wilson could provide documentation that Loveless was not working that day. Attorney Sutherland testified Mr. Wilson provided documentation that Loveless was not paid for any work during the week of November 18, 2014. The payroll documentation was admitted into evidence as State's Exhibit 5 (*see* ECF No. 6-7 at 150 (documentation)).

Attorney Sutherland testified he and Loveless discussed strategy and determined the best defense witness was Earlene Millender, who would testify she was present when the assault occurred on November 18, 2014, and the assailant was Mike Davis, not Loveless, because she (Millender) had taken Loveless to work that day (ECF No. 6-7 at 134–38). Attorney Sutherland testified he and Loveless decided not to call Randy Wilson as a trial witness, because he would testify Loveless was not at work that day. Sutherland testified Loveless never asked him to obtain bank records (*id.* at 136).

Loveless testified at the evidentiary hearing. He testified Attorney Sutherland never told him what information Randy Wilson provided or that Wilson was not helpful to the defense (ECF No. 6-7 at 118–24). Loveless testified he never had any concerns about how Attorney Sutherland was handling the case or the theory of defense, because he (Loveless) told Sutherland he wanted to testify that he was at work at the time of the offenses. Loveless testified he asked Attorney Sutherland to obtain copies of his paychecks from his bank.

The state post-conviction record also included portions of the trial transcript. At trial, Ms. Earlene Millender testified that on November 18, 2014, she, her daughter, and Michael Jones went to Tynesha Avant's (the victim) house (ECF No. 6-7 at 160–70 (excerpt from trial transcript attached to state court's order); *see also* ECF No. 6-2 at 274–87 (trial transcript)). Ms. Millender testified Loveless was not with her when she went to Ms. Avant's house (ECF No. 6-2 at 277, 287). Ms. Millender testified Michael Jones got into a heated argument with Ms. Avant. Ms. Millender's daughter, Dallas Morrell, also testified at trial that the man with her and Ms. Millender that day was Michael Jones (ECF No. 6-7 at 172–75 (excerpt from trial transcript attached to state court's order); *see also* ECF No. 6-2 at 301–18 (trial transcript)). Loveless testified at trial that he was at work at the time of the offenses

(ECF No. 6-7 at 177–79 (excerpt from trial transcript attached to state court's order);

*see also* ECF No. 6-2 at 342–48 (trial transcript)).

The state circuit court adjudicated Loveless' IAC claim as follows:

> Generally, in order to prevail on a claim of ineffective assistance of counsel, Defendant must show both deficient performance by counsel and resulting prejudice from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In other words, for Defendant's ineffective assistance of counsel claims to be successful, he must prove (1) that that his counsel's performance was unreasonable under the "prevailing professional norms" and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Taylor v. State*, 3 So. 3d 986 (Fla. 2009). Thus, there are two prongs to a court's analysis of a claim of ineffective assistance of counsel: a deficiency prong and a prejudice prong. "Failure to establish either prong results in a denial of the claim." *Preston v. State*, 970 So. 2d 789, 803 (Fla. 2007).

> As to the deficiency prong, the Sixth Amendment requires reasonably effective counsel, not perfect or error-free counsel. *See Terrell v. State*, 9 So. 3d 1284, 1288 (Fla. 4th DCA 2009). "[W]e have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

> As to the prejudice prong, under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). "Post-conviction relief cannot be based on speculative assertions." *Jones v. State*, 845 So. 2d 55, 64 (Fla. 2003). For a *Strickland* claim to be meritorious, a defendant must show that he was deprived of a fair trial, a trial whose result is reliable. *See Strickland*, 466 U.S. at 687.

> Defendant's first claim is that his counsel failed to investigate an alibi witness. Specifically, Defendant asserts he told his counsel he was

not present at the crime scene, and his work supervisor, Randy Wilson, could verify that Defendant was working at the time of the offense.

The Court granted a limited evidentiary hearing to address this claim on February 4, 2020. At the hearing, trial counsel, Stephen Sutherland, affirmed that Defendant informed him of his purported alibi. Defendant gave Mr. Sutherland the name of his supervisor, Randy Wilson, but was unable to provide an address. Defendant also gave Mr. Sutherland the incorrect name of his employer. Due to the lack of information, Mr. Sutherland was unable to engage in any meaningful investigation until Defendant's girlfriend, Earlene Millender, provided the correct company name and an address.

Mr. Sutherland diligently attempted to speak with Mr. Wilson, to no avail. Mr. Wilson would not return Mr. Sutherland's repeated requests for a phone call, both by letter and by personal visits to the business.[FN 2] Finally, service of a subpoena for deposition prompted Mr. Wilson to contact Mr. Sutherland.[FN 3]

Mr. Wilson informed Mr. Sutherland he did not know if Defendant worked on the relevant date; however, he indicated he had payroll records which showed Defendant was not payed [sic] that week, indicating he had not worked that week. Mr. Sutherland agreed to excuse Mr. Wilson from the subpoena if he would provide copies of the payroll records.[FN 4]

Defendant testified he was at work at the time of the offense.[FN 5] Mr. Sutherland presented two eyewitnesses to the offense who testified Defendant was not with them; rather, the assailant was an individual named Mike Davis.[FN 6] Based on Mr. Sutherland's investigation, Mr. Wilson would have testified he had no personal knowledge of whether Defendant was at work at the time of the offense; however, payroll records clearly indicated he was not.[FN 7] Mr. Sutherland credibly testified he discussed these matters with Defendant. The Court rejects Defendant's testimony to the contrary.

[FN 7: At the evidentiary hearing, Mr. Loveless asserted for the first time that he requested Mr. Sutherland to

subpoena his bank records to show he deposited his pay the week of the offense, which, according to Defendant, would rebut the payroll records. Defendant's attempt to supplement his motion with additional claims is untimely. Further, had counsel sought such records, they could not demonstrate the actual dates and times Defendant supposedly worked. Moreover, these new assertions undermine Defendant's credibility. Defendant testified Mr. Sutherland never discussed the payroll records and the problems they presented for his intended alibi defense; however, Defendant unequivocally stated at the evidentiary hearing that he told Mr. Sutherland to get his bank records to rebut the payroll records. If, in fact. Mr. Sutherland had not advised Defendant about the payroll records, Defendant would have had no reason to believe evidence rebutting such records was relevant or necessary.]

Mr. Sutherland elected to not call Mr. Wilson at trial based on a reasoned, strategic determination that his testimony would have been inconsistent with the testimony of Defendant and other defense witnesses. "Whether to call a witness at trial is the type of strategic decision for which the lawyer's professional judgment is generally not subject to postconviction second-guessing . . . ." *Burkhalter v. State*, 79 So. 3d 314,316 (Fla. 1st DCA 2019) (citations omitted). Mr. Sutherland's assessment was objectively reasonable, and therefore, cannot serve as a basis for postconviction relief.

(ECF No. 6-7 at 152–54) (footnotes citations to evidentiary hearing transcript and exhibits omitted). The First DCA affirmed the circuit court's order per curiam without written opinion. *Loveless v. State*, 324 So. 3d 931 (Fla. 1st DCA 2021) (Table).

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011); *see also Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *see also Smith v. Kemp*, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts

in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").

Questions of the credibility and demeanor of a witness are questions of fact. *See Consalvo*, 664 F.3d at 845 (citation omitted). "The deference compelled by the AEDPA 'requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations.'" *Nejad v. Attorney*, 830 F.3d 1280, 1292 (11th Cir. 2016) (quoting *Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003)). Instead, "[i]n the absence of *clear and convincing evidence*, [federal courts] have no power on federal habeas review to revisit the state court's credibility determinations." *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1259 (11th Cir. 2013) (emphasis added).

Loveless has not demonstrated by clear and convincing evidence that the state court's credibility determinations (i.e., that Attorney Sutherland's testimony was credible, and Loveless' testimony was not) were unreasonable. The federal court thus defers to those findings. The court also defers to the state court's findings with respect to the evidence presented at the post-conviction evidentiary hearing as those findings are supported by the state court record.

Considering Attorney Sutherland's credible testimony and the documentary evidence presented at the evidentiary hearing, the state court reasonably concluded

Attorney Sutherland made a reasonable, strategic decision not to call Randy Wilson as a trial witness because Wilson's testimony would not have supported the defense theory that Loveless was at work when offenses occurred, and that Ms. Avant thus misidentified Loveless as the assailant.

Loveless has not demonstrated that the state court's adjudication of Ground One was based upon an unreasonable determination of the facts, or that the court's adjudication was contrary to or an unreasonable application of *Strickland*. Loveless is thus not entitled to federal habeas relief on Ground One.

**B.    Ground Two: "Petitioner was denied effective assistance of counsel where his trial counsel failed to object to improper bolstering denying him the right to fair trial in violation of the 6th Amendment of the Federal Constitution."**

Loveless alleges the prosecutor improperly bolstered the victim's testimony during closing arguments by stating, "Ms. Avant has no reason to lie. She has no reason to come in here and tell you guys it was Mr. Loveless. We haven't heard any biases against Mr. Loveless . . . . She has no reason to say it was him unless it was him." (ECF No. 1 at 10). Loveless asserts defense counsel was ineffective for failing to object to the comments, and counsel's failure to object deprived him of a fair trial (*id.*). Loveless states he presented this IAC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 11).

The State asserts an exhaustion defense (ECF No. 6 at 20, 27–31). The State contends although Loveless presented this IAC claim in his amended Rule 3.850 motion, he did not present it on appeal to the First DCA (*id.*). The State argues Loveless is now procedurally barred from appealing the circuit court's denial of this IAC claim; therefore, the claim is procedurally barred from federal review (*id.*). The State alternatively argues Ground Two is without merit (*id.* at 32–34).

Before seeking federal habeas relief under § 2254, the petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must fairly present his federal claim to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In Florida, an appellant appealing the denial of a Rule 3.850 motion after an evidentiary hearing was held on one or more claims must raise and fully address in his brief all arguments on which he seeks appellate review. *See* Fla. R. App. P. 9.141(b)(3). The appellate court will not review claims that are not briefed. *See*

*Watson v. State*, 975 So. 2d 572, 573 (Fla. 1st DCA 2008) (holding that an appellate court "may review only those arguments raised and fully addressed in the brief"); *see also Roderick v. State*, 284 So. 3d 1152, 1154 (Fla. 1st DCA 2019) (holding that three of defendant's seven post-conviction claims were not subject to appellate review because the defendant did not argue them in his brief) (citing *Watson*, 975 So. 2d at 573).

The state court record supports the State's exhaustion defense. In Loveless' initial brief to the First DCA, he did not include any argument on the IAC claim presented here in Ground Two, i.e., defense counsel's failure to object to the prosecutor's alleged bolstering of Ms. Avant's testimony (*see* ECF No. 6-12 (Loveless' initial brief)). Loveless' failure to present Ground Two renders the claim procedurally defaulted for federal habeas purposes.

A federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right. *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

The Supreme Court has also recognized a "fundamental miscarriage of justice" exception to the procedural bar, which is satisfied where the petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Loveless has not alleged cause for his procedural default of Ground Two. Nor has he demonstrated he is entitled to federal review of his IAC claim through any recognized exception to the procedural bar. Therefore, Loveless is not entitled to federal habeas relief on Ground Two.

**C.    Ground Three: "Petitioner was a denied [sic] the right to fair trial and due process where his the [sic] prosecution shifted the burden of proof during witness examination and closing arguments, suggesting that the Defendant had the burden of proving he did not commit the crime in violation of the 6th Amendment of the Federal Constitution."**

Loveless alleges the prosecutor elicited testimony from State's witness Deputy Southern and defense witness Earlene Millender suggesting Ms. Millender failed to provide law enforcement with sufficient information to investigate Michael Davis as the man who committed the assault and battery on Tynesha Avant (ECF No. 1 at 12–15). Loveless alleges the prosecutor also improperly argued during closing arguments that the jury should reject Loveless' mistaken identity defense because Ms. Millender failed to provide law enforcement with sufficient identifying information regarding Michael Davis. Loveless contends the prosecutor's questions and arguments improperly shifted the burden of proof to the defense. Loveless states he presented this claim on direct appeal (*id.* at 15–16).

The State construed Ground Three as asserting an IAC claim based upon defense counsel's failure to object to the prosecutor's alleged burden-shifting (ECF No. 6 at 35–37). The State asserts Loveless exhausted Ground Three by presenting it in "postconviction motions" (*id.* at 20). The State contends the state court's adjudication of Ground Three was not contrary to or an unreasonable application of *Strickland* (*id.* at 35–37).

The State has misconstrued the claim presented in Ground Three. Loveless does not characterize his claim as an IAC claim or allege defense counsel erred by failing to object to the prosecutor's alleged burden-shifting; rather, Loveless argues

the alleged burden-shifting as purely a fair trial claim. Further, Loveless clearly states he exhausted Ground Three by presenting it on direct appeal, not in a post-conviction proceeding (ECF No. 1 at 15–16). The court thus construes Ground Three as what Loveless says it is, a claim that the prosecutor's alleged burden-shifting during witness examinations and closing arguments deprived him of a fair trial.[3]

### 1.    Clearly Established Federal Law

To establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair. *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1983) (citations omitted); *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987).

A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). The prosecutor is not limited to a bare recitation of the facts; she may

---

[3] To be clear, Loveless presented Ground Three on direct appeal, as he says. Loveless argued in his initial brief on direct appeal that fundamental error occurred at trial because the State shifted the burden of proof during witness examination and closing argument, suggesting that Loveless had the burden of proving he did not commit the crime (*see* ECF No. 6-3 at 25–30). Contrary to the State's assertion, Loveless did not present an IAC-related claim in his Rule 3.850 motion (*see* ECF No. 6-7 at 34–44).

comment on the evidence and express the conclusions she contends the jury should draw from the evidence.  *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984).

Furthermore, prosecutors may argue about the defense witnesses' credibility when the defense has attacked the State witnesses' credibility.  *United States v. Eley*, 723 F.2d 1522, 1526 (11th Cir. 1984).  A prosecutor also may properly comment on the failure of the defense to counter the evidence presented by the government.  *See United States v. Watson*, 866 F.2d 381, 386 (11th Cir. 1989) (finding proper prosecutor's comment in response to defense counsel's argument that the government failed to disprove alternative explanations).  When "the prosecutor merely emphasize[s] the defense's failure to produce" evidence to rebut the government's argument, "such an argument [is] permissible."  *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998) (emphasis omitted).

However, "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."  *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).  Having said that, "prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof."  *Id.* at 1087.

"[T]he limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). A prosecutor's remarks are considered under the totality of the circumstances. *Hall v. Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984). "The relevant question is whether the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

### 2.    Federal Review of State Court Decision

In Loveless' initial brief on direct appeal, he described the following questioning as improper burden-shifting:

> The state elicited testimony from the law enforcement officers that they were unable to determine who Michael Davis was because Earlene provided them only with a name. Deputy Southern testified that he expected to get a phone call from Michael Davis after speaking to Earlene, but Michael Davis never called. On redirect, Deputy Southern attributed his failure to investigate Michael Davis to Earlene's reluctance to provide him with information.

> The defense called Earlene as a witness. Earlene testified that she received a phone call from an officer shortly after the incident. She stated that in response to the officer's question, she told him that she was with Michael Davis. She further testified that she told the officer everything she knew about Michael Davis, but she did not know exactly where he worked or lived because he was a "street boy." Earlene testified that she was never contacted by the police again. On cross-examination, the following exchange took place:

Q: Now, when you left, you didn't call the police, did you?

A: No.

Q: Okay. Have you seen Mike Davis since this incident?

A: Yes.

Q: And you saw him on the beach after it happened; right?

A: Uh-huh.

Q: Is that a yes?

A: Yes.

Q: Did you talk to him?

A: Not really.

Q: Did you try to get information from him?

A: No.

Q: Did you try to get his address?

A: No.

Q: Did you try to get his phone number?

A: No.

Q: And did you call the police that day when you saw him at the beach?

A: No.

(ECF No. 6-3 at 25–28 (Loveless' initial brief)) (citations to trial transcript omitted).

In his initial brief, Loveless asserted the prosecutor improperly argued during closing in rebuttal that the jury should conclude Loveless committed the crime because the defense witness had not provided the necessary evidence to prove the theory of defense: "What information did [Earlene] give the police to say it was Mike Davis? It was not Mr. Loveless. It was Mike Davis. That's the information she gave the police, Mike Davis." (ECF No. 6-3 at 27). Loveless argued the prosecutor then provided the jurors with an exhaustive list of the information Earlene failed to produce:

> Both police officers testified today that she did not give them a single bit of information other than Mike Davis. She did not tell them, I don't know where he lives. She did not tell them, I don't know his phone number. She did not tell them, I think he lives in Lincoln Park. She did not tell him—them, he's a black male. She did not say this is his height. She did not say this is his hairstyle. She did not say he's dark complected. We heard that today, not 15 months ago when this crime happened, because Mike Davis is not the person who committed the crime. And if he was, when she saw him at the beach, don't you think she would have went up to him and said, hey, where are you staying at these days? Can I get a phone number for you? Or pick up the phone and call the sheriff's office and say, hey, that guy that committed the shooting back on November 18th, I found him at the beach. Why don't you guys come arrest him for it? She didn't do any of that because Mike Davis didn't commit this crime. Mike Davis may not even exist, but he didn't commit this crime.

(ECF No. 6-3 at 27–28).

The First DCA affirmed Loveless' judgment and sentence per curiam without written opinion (ECF No. 6-5 (decision)). *Loveless v. State*, 226 So. 3d 819 (Fla. 1st DCA 2017) (Table).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See Richter*, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See Richter*, 562 U.S. at 102.

As previously discussed, judicial review of a claim of prosecutorial misconduct requires the court to consider whether the prosecutor's comments were improper and whether they so infected the trial with unfairness as to make the

resulting conviction a denial of due process.  The court must view the prosecutor's comments in the context of the evidence presented at trial and the parties' comments during opening statements and closing arguments.  The following is a summary of Loveless' trial proceedings.

During opening statements, defense counsel told the jury he expected the evidence would show that the victim, Tynesha Avant, was mistaken as to the identity of the man who assaulted and battered her (*see* ECF No. 6-2 at 190–93).  Defense counsel told the jury the evidence would show that Earlene Millender borrowed Loveless' car, and Millender and her acquaintance, Michael Davis, went to Ms. Avant's home.  Defense counsel told the jury that Ms. Millender told police that Michael Davis was the man in the car with her, but police were unable to locate Davis.

Tynesha Avant testified that on November 18, 2014, between 8:30–9:00 a.m., she was in her kitchen and heard a knock on the front door (ECF No. 6-2 at 194–224).  Ms. Avant testified she opened the door, and Earlene Millender and Loveless (whom Avant identified in court) were standing there.  Ms. Avant testified she invited Ms. Millender and Loveless into her home, but only Ms. Millender entered. Ms. Avant testified Ms. Millender told her that Dallas, Millender's daughter, was outside in the car.  Avant testified she went to the car and spoke to Dallas.  Ms. Avant

testified  Dallas was sitting in the back seat on the passenger side, and Loveless was standing on the other side of the car pacing.  Ms. Avant testified another man was sitting in the back seat with Dallas.  Ms. Avant testified she spoke to Dallas, and Loveless became irate, yelling that he was going to kill Ms. Avant's son, Derrell, who was Dallas' boyfriend.  Ms. Avant testified Loveless punched her, and she bent down to get a brick.  Avant testified Loveless then pulled out a gun and started shooting at her legs.  Ms. Avant testified Earlene Millender told Loveless to stop, and Loveless and Millender got in the car and left.  Ms. Avant testified Loveless was driving the car.

Ms. Avant testified she knew that the man who shot at her was Loveless even though she did not know his name.  Ms. Avant testified she had seen Loveless on a prior occasion when she went to Ms. Millender's house to pick up her son, Derrell. Ms. Avant testified when she picked up Derrell, she saw Loveless working on his car, which was the same car Ms. Millender and Loveless drove to her home on November 18.  Ms. Avant testified she identified the shooter in a photo line-up.

Deputy David Ramires testified he initially developed a suspect named Jerome Ross, because he was Earlene Millender's past boyfriend (ECF No. 6-2 at 227–42).  Deputy Ramires testified he included Ross' photo in a photo line-up, but Ms. Avant stated none of the photos matched her assailant.  Ramires testified he

developed Loveless as a suspect after he went to Ms. Millender's home and saw a car that matched Ms. Avant's description. Deputy Ramires testified he included Loveless' photo in another photo line-up.

Deputy Jeremy Southern testified he spoke to Earlene Millender on November 18, 2014, or shortly thereafter (ECF No. 6-2 at 245–54). Deputy Southern testified Ms. Millender was very hesitant and reluctant to answer questions. Deputy Southern testified Ms. Millender identified the man with her as Michael Davis, but Millender did not provide any other information about him. Deputy Southern testified he did not make any further attempts to obtain information about Michael Davis from Ms. Millender.

Investigator Melissa Salter testified she presented a photo line-up to Tynesha Avant on December 6, 2014 (ECF No. 6-2 at 255–59). Investigator Salter testified within two seconds of showing Ms. Avant the photos, Ms. Avant identified Loveless as the man who hit her and shot at her.

The defense presented testimony from Earlene Millender. Ms. Millender testified that on November 18, 2014, she, her daughter, and Michael Davis went to Tynesha Avant's house in Loveless' car (ECF No. 6-2 at 274–87). Ms. Millender testified Ms. Avant became angry, and Michael Davis got out of the car and began arguing with Ms. Avant. Ms. Millender testified she saw Michael Davis raise his

hand toward Ms. Avant but did not recall if Davis actually struck Avant. Ms. Millender testified she got in the car and left with her daughter. Ms. Millender testified she never heard gun shots. Ms. Millender testified she told an officer that Michael Davis was with her that day, and that she knew Michael Davis from Lincoln Park. Ms. Millender testified she drove Loveless' car to Ms. Avant's home on November 18, but Loveless was not with her.

On cross-examination, Ms. Millender admitted she testified in her pre-trial deposition that she saw Michael Davis actually strike Ms. Avant (ECF No. 6-2 at 288–93). Ms. Millender testified she saw Michael Davis on the beach after the incident. The prosecutor then questioned Ms. Millender in the manner Loveless characterizes as burden-shifting:

> Q: Now when you left, you didn't call the police, did you?
>
> A: No.
>
> Q: Okay. Have you seen Mike Davis since this incident?
>
> A: Yes.
>
> Q: And you saw him on the beach after it happened; right?
>
> A: Uh-huh.
>
> Q: Is that a yes?
>
> A: Yes.

Q: Did you talk to him?

A: Not really.

Q: Did you try to get information from him?

A: No.

Q: Did you try to get his address?

A: No.

Q: Did you try to get his phone number?

A: No.

Q: And did you call the police that day when you saw him at the beach?

A: No.

(ECF No. 6-2 at 292).

On re-direct examination, defense counsel asked Ms. Millender if she told Michael Davis he needed to contact the police (ECF No. 6-2 at 294). Ms. Millender responded no. Defense counsel asked Ms. Millender if she told Michael Davis that police inquired about him. Ms. Millender again responded no.

Ms. Millender's daughter, Dallas Morrell, testified her mother's friend named Michael was with her and her mother when they drove to Tynesha Avant's house on November 18, 2014 (ECF No. 6-2 at 301–19). Ms. Morrell testified her mother drove Loveless' car to Ms. Avant's house. Ms. Morrell testified she was sitting

alone in the back seat, and Michael was sitting in the front passenger seat.  Ms. Morrell testified Loveless was not with them when they drove to Avant's house.  Ms. Morrell testified her mother and Ms. Avant were talking near the back of the car, and Michael got out of the car.  Ms. Morrell testified her mother got back in the car, and she and her mother left.  Morrell testified she did not see Michael hit Ms. Avant, nor did she hear gunshots.

During cross-examination, Ms. Morrell testified her mother and Loveless were friends but not girlfriend and boyfriend.  Ms. Morrell also reiterated that "Michael" did not get in the car with her and her mother when they left Ms. Avant's house.  The prosecutor impeached this testimony with Morell's prior statement during her deposition, that her mother and Loveless were "basically" girlfriend and boyfriend, and that "Michael" was in the car with her and her mother when they left Ms. Avant's house.

On re-direct examination, Ms. Morrell testified she did not remember if "Michael" left with her and her mother.

Loveless testified on his own behalf.  Loveless testified he was not present when Ms. Avant was assaulted on November 18, 2014 (*see* ECF No. 6-2 at 342–48).  Loveless testified he loaned Earlene Millender his car that day and was at work when

Ms. Avant was assaulted.  Loveless admitted he was previously convicted of three misdemeanors involving crimes of dishonesty and eight felonies.

The prosecutor recalled Deputy Southern as a witness (ECF No. 6-2 at 349–51).  Deputy Southern testified Earlene Millender told him she saw a firearm that day at Ms. Avant's house, but Ms. Millender would not say who brandished or discharged it.

Prior to closing arguments, the court instructed the jury, "Please remember that what the attorneys say is not evidence or your instruction on the law.  However, do listen closely to their arguments.  They are intended to aid you in understanding the case." (ECF No. 6-2 at 366).

The prosecutor argued, in relevant part:

> Now, yesterday at jury selection we talked about who has the burden of proof today and what that burden of proof is.  The State, that's me, has to prove beyond a reasonable doubt that the defendant committed the crimes with which he was charged.
> . . . .
> So the main issue that we have in this case is who did it.  I think from all the evidence it's very clear that this happened, that a man came to Ms. Avant's house, threatened her with a gun and fired that gun.  That's not really a question today.  The question is who did it?
>
> Look at the evidence we have.  Tynesha said he was this close to her face.  And she says—she told you one hundred percent—the Defense Attorney asked her on cross-examination and she told you one hundred percent that's the guy that shot at me.

(ECF No. 6-2 at 366–71).

Defense counsel argued, in relevant part:

Please remember that what I'm telling you right now is not evidence of this case. It's like what Ms. Reid had told you is not evidence in this case, it's just our thoughts, our inferences, and our put together in this case here to demonstrate on this thing.

. . . .

Now, the law doesn't require that Mr. Loveless prove his innocence. That's very, very important. That is presumed. When there is a failure of the evidence, the doubt goes in Mr. Loveless's favor.

. . . .

Now, the Judge is going to instruct you that unless guilt is proven and proven beyond a reasonable doubt, you must acquit even if you think there may be a possibility that Mr. Loveless has committed these crimes.

. . . .

Now, I'm going to give you some reasons—and, again, this is not evidence. I'm going to give you some reasons of why there is doubt from inferences and things of this nature here. Now, you realize that I can't talk to you much about the crime because Mr. Loveless and myself, we don't know what happened as far as the crime is concerned except for what we've read because he wasn't there. And I think that you all follow the line there that he wasn't there. So he doesn't know if there was a shooting. He doesn't know if there was a discharge of a weapon in the air or whatever, because he wasn't there.

. . . .

And on this occasion here, Mr. Loveless had let her [Earlene Millender] borrow the car because he was—he had gone to work and he said that he was a car detailer and things of that nature there. She said that she went to pick up her daughter and she had another guest at her house named Michael Davis. And she described Mr. Davis. And you could tell from her description of Mr. Davis that I don't think that she was real happy with Mr. Davis, but apparently he was a lover and had spent the night at her house or whatever. But he was not going to stay in her house while she—by himself while she went to get her daughter. And so he came along. What we should notice here is that— and she said that [sic]. And she also later in her testimony said that the reason it was difficult to find Mr. Davis, she thinks he lives over in

Lincoln Park is because he's a street person. And I'm not so sure what a street person's definition is. I always thought it was somebody that kind of wanders from one household to another household taking advantage of whatever person he was with at that particular time.

. . . .

We obviously have a misinterpretation or a misunderstanding about who did this.

The person that did this was a light colored black man with corn rows in his hair. And Ms. Millender—or Ms. Avant says I seen [sic] him one time before and he's the boyfriend of Ms. Millender and I think his name is Deandre, and that Ms. Morrell—Ms. Morrell, the daughter, refers to him as step-dad.

Now, you're going to get to see the photo lineup and you're going to get to see Mr. Loveless's picture there. And that's all she said.

Now, Mr. Loveless has a very distinct feature that he's had in that photo that they've shown to her or whatever. He has a beard. And there was no mention of a beard. And you look in the photo, there's no corn rows in his hair or anything of that nature there. And you heard Ms. Morrell testify that that's Donnell. That's not step-dad, that's Donnell.

You heard Mr. Loveless get on the stand and he says I wasn't there, I was at work, or he thinks he was at work.

I said, Well, you got arrested two-and-a-half months later, no one knew about these charges, things like that. So he got arrested. So it was kind of hard for him to pinpoint where he was. But we know from Ms. Millender and from Ms. Morrell and from Mr. Loveless that he wasn't—that he was not at any scene of any shooting. That's for sure.

Now, why would Ms. Avant indicate that Mr. Loveless was the one that did it?

Well, Ms. Avant was still very, very angry and upset about it, and even today. She'd only seen Mr. Loveless on one prior occasion,

but she was very adamant about whose car it was because she had seen the car several times.  And so she has associated Mr. Loveless with that car and that's who it was.

And we know that Mr. Loveless wasn't in the car.  Mr. Loveless wasn't even driving.  And we know that Ms. Millender was driving. And I'm sure if Mr. Loveless had been there, Mr. Loveless would have been the driver.  And then to throw the kink into the armor of the chain, there is—on the stand today, unknown to everybody, there's the fourth person in the car, the ideal witness.  The defense counsel didn't know anything about that witness.  The State Attorney didn't know anything about this witness.  The police officer certainly didn't know anything about this witness because it had never been brought up before.  This was a concoction that came today about this fourth person that's sitting in the car, that other witness.  Because, you know, if we would have known all that and that person really existed, that person could be here today and that would have probably settled a lot of matters.

But that person did not exist.  That person was a concoction of Ms. Avant's mind in trying to convince herself that Mr. Loveless is the one that did all this to her.

I think what happened is that she associated Mr. Loveless to the car and she was upset because this thing has happened pretty good [sic] and that's who she blamed and that's who she continued to blame.  But we know from the witness's testimony and things like that that Mr. Loveless was not there that day.

. . . .

So ladies and gentlemen, what you have to decide now is we've had ample opportunity to make a determination who is responsible for this, but I think that the evidence shows that Mr. Loveless did not do it. He was not there.  And we've heard from two different witnesses that he was not there.  He's told you himself that he was not there and did not do this.  And so we talked about—well, Ms. Millender created a person, Michael Davis.

Well, Ms. Millender, when the police officers came to talk to her, wasn't aware of what happened until the police officers started explaining it. And she said, well, yeah, that guy in my car was Michael Davis, but I don't know where he's at. And she was—the police officer said she was hesitant in her conversation with them and things like that. But you got to understand, a lot of people are hesitant in conversations and things. Ms. Millender was quite surprised that this had even escalated to this extent because she was unaware of the shooting and things like that. And she said Michael Davis, but I don't know where he's at. I don't know how you can get in touch with him because, like she said on the stand, he's a street person. I don't know where he's staying tonight. I don't know what lady he's with, or whatever. And so we ran Michael Davis through the things there, and there are just too many Michael Davises to do a whole bunch of follow-up. And so that was kind of a dead end.

And then there was some testimony. She said, well, she saw Michael Davis later, which she didn't tell him to go talk to the police or anything like that. I don't think she had an obligation to do that, and I'm not so sure that even at that time she realized the consequences of this thing here to tell Mr. Davis that he needed to go talk to the police. So she didn't ask him that.

So what it boils down to, when you get everything done, and I'm glad that y'all listened. And remember at the very beginning I asked you to listen to everything and not make up your mind until you heard everything, is that Mr. Loveless was not there, that apparently this Michael Davis, because that's who it is, is the one that we're looking at. And Mr. Loveless doesn't fit the description that was given to the police, even though Ms. Avant said, yep, that's him. That's not the description she gave the police, if you will remember what the description was and look at the photograph and things like that. And I'm sure that after you take all of this into consideration, you'll find that there's not sufficient evidence to convict Mr. Loveless.

(ECF No. 6-2 at 371–87).

In rebuttal, the prosecutor argued:

[T]he police actually went through three people in this investigation to determine who committed this crime.

If you remember, there was the very first photo lineup with Jerome Ross that they showed to Ms. Avant. And Ms. Avant said, no, none of those people in the photo lineup are the person that shot me that day, or shot at me that day.

When they got the information, the name Mike Davis, they tried to search his name through their system that they use to look up people's names, and they just didn't have enough information.

Then they found Mr. Loveless's name, and they created another photographic lineup, which you will be able to take back there with you. You'll see the six different photographs that Ms. Avant saw. You'll see where she circled Mr. Loveless's photo.
. . . .
So let's talk about the credibility of the other witnesses. As I told you, Tynesha Avant, she told you—she said, If I got that brick, I was going to hit him.

What was she trying to hide up there?

I submit to you she wasn't trying to hide anything. She was just trying to tell you what she remembered happening that day.

What was inconsistent in her testimony?

The inconsistency in her testimony was that when the defendant was shooting at her, she told the police 15 months ago when this happened that she turned her back and then looked back, and when she looked back he was pointing the gun.

What she told you today is I never completely turned my back on him because I didn't want him to shoot me in the head, but I did turn some. This happened 15 months ago. Is that such an inconsistency to make you think she was lying then or she's lying now?

But let's look at some of the other inconsistencies in the statements.

Ms. Millender told you today, I don't know anything about a shooting.  I don't know anything about a gun.  I—I got in my car with my daughter and we took off and we left.

What did Deputy Southern tell you when he talked to her the day this happened?

Yeah, I saw a gun.  Yeah, somebody discharged a gun, I'm just not going to tell you who did it.  Because she wouldn't cooperate with them because she didn't want to get her boyfriend at the time in trouble.

Also, let's think about what Dallas Morrell said.  She had several inconsistencies.  First she said, yeah, it was just me and my mom that left.  Then when I cross-examined her and forced her to look at her deposition, she said, yeah, that the guy left with us.

Then I questioned her and I said, are—your mom and Mr. Loveless are boyfriend and girlfriend; right?

No.

Do you want to look at your deposition?  Because at your deposition you said that they were boyfriend and girlfriend.  I said, Mr. Loveless lived with you guys; right, with you and your mom?

No.

Do you want to look at your deposition?

Yeah.  I said back then that he lived with us.

She said—she told us today that Ms. Avant was getting loud.

I said, Well, back at your deposition you said that your mom and Ms. Avant weren't getting loud; right?

She was—Ms. Avant was getting loud.

I said, again, Do you want to see your deposition and see what you told us at the deposition that says your mother and his mother weren't getting loud, that it was actually the man that was getting loud?

She had all of those inconsistencies today.

Now, the defense would like you to believe that another inconsistency with Ms. Avant is that this fourth person in the car was all of a sudden made up today.

Have you ever thought that maybe that fourth person was Mike Davis?

But Mike Davis says, you're trying to pin this on me? No way am I getting involved.

Maybe Mike Davis was that fourth person sitting in the back seat and that's why Ms. Millender doesn't want to tell you he existed. Mr. Morrell—or Ms. Morrell doesn't want to tell you he existed, and the defendant doesn't want to tell you that he existed because then they can't blame this crime on him if he was sitting in the back seat at the time.

So the defendant tells you that he was at work that day, and he also—everybody wants to deny their relationship that's going on between the defendant and Ms. Millender.

Ms. Millender said she's just a friend. Ms. Dallas Morrell said that he was just a friend until I had proved to her that she had said otherwise before and she was just being dishonest today. And even the defendant said, well, it's not a committed relationship. It's just sexual.
. . . .
But he wants you to believe that he was at work that day. The only evidence we have that he was at work that day comes from him,

an eight time convicted felon and three times convicted of a crime of dishonesty.

He says he didn't know anything about this crime until he was arrested later in January, and that this job is part-time on and off, works sometimes, doesn't work sometimes. Then how are you so sure that on the 18th you were at work?

I asked him, what time did you get there?

Between 7:30 and 8:30.

When I made him pin down an answer, he said 7:45.

What did you do that day?

What I do every day.

Well, if this day is so important to you that you know you were at work on the 18th, what did you do that day?

He doesn't know that he was at work. As a matter of fact, he knows he wasn't at work because he was at Ms. Avant's house. He was there with his car, with Ms. Millender, with Dallas Morrell.
. . . .
So, again, we come down to the biggest issue in this case. How do we know that it was the defendant at that house and not Mike Davis?

Well, first of all, Dallas Morrell, when she took the stand, she said his name was Mike Dubuois. I have no idea where that came from.

Ms. Millender, who wants you to believe that it was Mike Davis that did it and wanted the police to believe that.

What information did she give to the police to say it was Mike Davis?

It was not Mr. Loveless. It was Mike Davis. That's the information she gave the police, Mike Davis.

Both police officers testified today that she did not give them a single bit of information other than Mike Davis. She did not tell them, I don't know where he lives. She did not tell them, I don't know his phone number. She did not tell them, I think he lives in Lincoln Park. She did not tell him—them, he's a black male. She did not say this is height. She did not say this is his hairstyle. She did not say he's dark complected. We heard that today, not 15 months ago when this crime happened, because Mike Davis is not the person who committed the crime. And if he was, when she saw him at the beach, don't you think she would have went up to him and said, hey, where are you staying at these days? Can I get a phone number for you? Or pick up the phone and call the sheriff's office and say, hey, that guy that committed that shooting back on November 18th, I found him at the beach. Why don't you guys come arrest him for it?

She didn't do any of that because Mike Davis didn't commit this crime. Mike Davis may not even exist, but he didn't commit this crime.

Also the description that Ms. Millender gave us today of Mike Davis was 5'10" or 11, dark complexion, short hair.

What did everybody say the description of the shooter was?

5'8", light or medium complexion and corn rows.

. . . .

And the reason that the police did not go back to Ms. Millender to ask her more information about Mike Davis is because she was uncooperative from the beginning. All she would say is Mike Davis, there was a gun, somebody shot one. That's it. When the police officer asked her, Did Mike Davis fire the gun?

The gun was fired.

But did Mike Davis do it?

The gun was fired.

So Deputy Southern told you, Why am I going to go back to her and try to pull information out from her when she already won't give it to me?

So the defendant—Ms. Avant has no reason to lie. She has no reason to come in here and tell you guys it was Mr. Loveless. We haven't heard her have any biases against Mr. Loveless, Ms. Millender, or Dallas Morrell. And she told you that she was closer to him than I am to you right now when he hit her and when he pointed a gun at her and when they were arguing before. And she said Loveless is the one who hit her. She picked him out of a photographic lineup three weeks after the event happened, and she sat here today and told you one hundred percent that's the guy that shot me. She pointed him out. One hundred percent, that's the guy that did it.

(ECF No. 6-2 at 387–98).

After closing arguments, the court instructed the jury that in order to prove each crime of which Loveless was accused, the State must prove each element of each crime beyond a reasonable doubt (ECF No. 6-2 at 399–410). The court instructed the jury:

Now, the defendant has entered a plea of not guilty. This means you must presume or believe the defendant is innocent. The presumption stays with the defendant as to each material allegation in the information through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.

To overcome the defendant's presumption of innocence, the State has the burden of proving the crime with which the defendant is charged was committed and that the defendant is the person who committed the crime.

> The defendant is not required to present evidence or prove anything.

(ECF No. 6-2 at 404).

The First DCA could have rejected Loveless' prosecutorial misconduct claim on the theory that the prosecutor's questioning of witness and comments during closing arguments were not improper burden-shifting. The prosecutor's questioning Deputy Southern and Earlene Millender about the information Millender provided to law enforcement regarding Michael Davis, and the information she did not provide or attempt to provide, were proper impeachment as they related to the credibility of her testimony. The prosecutor's questioning of witnesses did not suggest to the jury that Loveless was required to present evidence of his innocence or prove anything.

The same is true of the prosecutor's comments during closing arguments. In response to defense counsel's arguments that defense witnesses credibly testified that Michael Davis was the assailant and Loveless was not present during the assault, the prosecutor argued that the testimonies of Ms. Millender, her daughter, and Loveless were not credible. The prosecutor pointed out that Ms. Millender's testimony that she told law enforcement Michael Davis lived in Lincoln Park, was inconsistent with Deputy Southern's testimony that Ms. Millender did not provide this information. The prosecutor also argued that if Michael Davis was the man who

assaulted Tynesha Avant, then Ms. Millender would have been more forthcoming with information regarding Michael Davis when she learned law enforcement arrested Loveless, her boyfriend (according to Millender's daughter), for the offenses.  The prosecutor's comments did not suggest to the jury that Loveless was required to prove his innocence or present evidence of his innocence.  The prosecutor simply remarked on the credibility of the evidence, witnesses, and theories presented by the defense.

Moreover, the prosecutor and defense counsel reminded the jury that the State had the burden to prove Loveless' guilt beyond a reasonable doubt, and the trial court clearly instructed the jury, "The defendant is not required to present evidence or prove anything."

Fairminded jurists would not debate the First DCA's denial of Loveless' claim of prosecutorial misconduct.  And even if it was possible that fairminded jurists could disagree that the state court's rejection of the claim is inconsistent with Supreme Court precedent, this potential for disagreement precludes the federal court from granting habeas relief on this claim.  *See Richter*, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where

"there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2101) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."); *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief) (citing *Richter*, *supra*); *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 910 (11th Cir. 2011) ("[O]nly 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting *Richter*, 562 U.S. at 786).

For these reasons, Loveless is not entitled to relief on Ground Three.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    The petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    A certificate of appealability be **DENIED**.

3.    The clerk be directed to enter judgment accordingly and close the case.

At Pensacola, Florida, this 22nd day of April 2022.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**